Tucker, P.
Preliminary to any enquiry into the merits of this case, it is necessary to ascertain what is to be considered as constituting the record. And upon this point, I shall observe, that I take the whole pro *572 ceedings in the court of law, upon an issue directed out °f chancery for the purpose of ascertaining a particular fact, to be part and parcel of the chancery cause. The court of law is but ancillary to the court 0p chancery: it has no jurisdiction in such case, except that which is derived from the chancellor’s order: it must pursue his directions, admitting papers to be read which he orders to be read; and, if required, it must certify any instructions which are given to the jury, that the chancellor may decide whether they were rightly given or not: finally, it can give no judgment upon the verdict, but must certify it to the court of chancery to avail there as it may. Such being the case, the chancellor has a right to see the whole proceedings, and though to save costs the verdict only is certified, yet, in strictness, the whole record should be so. But were it otherwise, still the order to certify the verdict, necessarily implies, that every thing should be certified which was spread upon the record as part of the proceedings at the trial. The exceptions, therefore, ought to have been so certified; and, doubtless, they were so, since a motion was expressly made and entertained for a new trial of the issues, on the ground of misdirection set forth in those exceptions. In this case, indeed, unless we look to the law record, the whole proceeding appears irregular. The bill was filed in the court of chancery of Richmond, and the issue was directed by it, to be tried in the circuit court of King 8y Queen. Afterwards, the whole cause was removed to King Sf Queen. There it depended for several years, when, all at once, the case makes its appearance in Essex, without any order appearing by which it was sent thither, unless we look into the law record. There, indeed, we see the order sending it to Essex for the trial of the issue; but in the chancery record, no warrant for the action of that court appears. If the law record were, rejected, the court of Essex *573 would be found trying an issue without authority, and pronouncing a final decree upon it without jurisdiction. I do not, however, rest upon this necessity which the appellee is under to admit the law record. I go upon the broad ground, that upon the trial of an issue out of chancery to enlighten the conscience of the chancellor, the whole of the proceedings at the trial, so far as they are spread upon the record, properly constitute a part of the certificate of the verdict, and of course become a part of the chancery record.
It is next necessary to consider, whether, as the depositions of the witnesses taken before the issue was directed, were taken without due notice to a guardian of William Carlton, the chancellor was justified in directing the issue, and if not, what will be the consequence here. The depositions in question were proper evidence as to the other parties, and they were certainly read upon the hearing as to them. Suppose them to have been irregular as to William; ought the chancellor to have dismissed the bill ? or to have suppressed the depositions as to him, and given reasonable time to retake them ? The latter, assuredly. But the court did not suppress them : it read them: it treated them as good, either because there was no exception to them at that time, or because the exception was deemed invalid. It recognized the proof as sufficient ; and this court sees, that there was evidence, however irregular, that was all important. We ought, then, at most, to do what the court below should have done; suppress the depositions, and send the cause back, to give the parties an opportunity of retaking them. This is in the spirit of the cases of Duff v. Duff's ex'ors, 3 Leigh 523. Cropper v. Burtons, 5 Leigh 426. Miller v. Argyle's ex'or, Id. 460. Sitlingtons v. Brown & al. 7 Leigh 271. In this case, however, it will only be necessary to send the cause back for a new trial, as the record is now replete with evidence of the necessity of an issue.
*574 The only proper question in the cause is, whether there should be a new trial of the issues? I think there ought to be, both because they are not in all things responded to by the verdict, and because they were fou,n¿ under a misdirection of the judge.
In the first place, there were three enquiries directed: 1. Whether John Carlton was a white man? 2. Whether William, was the child of a black or a white father ? 3. Whether he was the lawfully begotten son of John Carlton ? To the second of these enquiries, there is no response. The jury answer only the first, distinctly; the second they answer not at all; the third they evade. They find, that William was born in wedlock, and that, according to law and the evidence introduced, he was the legitimate child of John and Sarah Carlton. But it does not follow, that he was the lawfully begotten son of John Carlton; since, if born in wedlock without impossibility of being so begotten, he would “ according to law” be held to be his legitimate child, though he may have been actually begotten by another. The verdict, then, not being responsive to the issues, should have been set aside; and the rather, as the most important enquiry is not answered by the verdict, namely, whether he was the child of á black or white father ?
2dly, The instructions of the court were, I conceive, manifestly erroneous. The court refused to admit evidence to prove that the defendant William was a mulatto, and that his mother and her husband John Carlton were both white; and refused also to admit the evidence of a scientific physician to prove, that there was no time at which sexual intercourse could take place between a white man and a white woman, that the white man could, according to the laws of nature, be the father of a mulatto child born of the white woman. In these opinions, it is implied, that the procreation of a mulatto child by a white man upon„ the body of a *575 white woman, is either not impossible, or at least not such an impossibility as the law will recognize as fixing the stamp of illegitimacy. To such opinions I cannot accede. If it fell within my province, I should say at once it was impossible. But perhaps it belongs to the jury to decide that matter upon the evidence of experts. This, however, was refused, evidently upon the ground, that even if impossible, it was not such an impossibility as would prove the child a bastard, provided, he was born in wedlock. I do not so understand the law. It is not this or that particular impossibility that bastardizes the child. The essence of the rule is, that if it be impossible that the husband can be the father, the child is a bastard. The cases of the husband being beyond sea, imprisoned, impotent, and the like, are but instances of the application of the rule. Even nonaccess, if proved, though the parties are in the same kingdom, will suffice. How, then, if the impossibility rests upon the laws of nature itself? Shall it be less regarded? Shall the white child of a white couple be bastardized, upon questionable proof that the husband was rendered impotent by disease; and shall we legitimate a negro because he was born in wedlock ? The learned judges give no countenance to such opinions. In the case of The king v. Luffe, lord Ellenborough said, “ Circumstances which shew a natural impossibility that the husband could be the father of the child of which the wife is delivered, whether arising from his being under the age of puberty, or from his labouring under disability occasioned by natural infirmity, or from the length of time elapsed since his death, are grounds on which the illegitimacy of the child may be founded.” He does not say they are the only grounds. The principle is, that if the procreation by the husband be impossible, the child is illegitimate. Accordingly, in the case of Bowles v. Bingham, judge Roane observes, “that the issue born during wedlock will be held to be legitimate, *576 unless it be conclusively shewn that a person other than the husband must necessarily and unavoidably have been the father.” Now, to my mind, this is conclusively shewn, when the married couple are white and child mulatto. But admit, that this is a physiological question, most proper for the jury upon the evidence of professional and scientific men, still the court of law erred in rejecting all testimony on that important point.*
*577 I am of opinion to reverse the decree, and direct a new trial of the issues; upon which, evidence that WilHam Carlton is a mulatto, and evidence also of professional men that, according to the course of nature, a mulatto child cannot be the offspring of two white persons, shall be admitted, if offered. And on such trial, the instructions given on the former trial are not to be repeated.

 Note by the president. I rest my opinions on this matter on grounds that seem to me to be altogether impregnable. 1. I take it, that what is against the uniform course of nature is impossible. It cannot be denied, indeed, that there are s.ometimes anomalies in nature, which it is beyond our ken to account for. Thus, until the birth of the Siamese twins, no physiologist would probably have admitted the possibility of such a lusus natures. But where the fact in question can be accounted for without supposing a deviation of nature from her ordinary laws, philosophy dictates the rejection of a theory in conflict with universal experience. Thus a white couple cannot (according to the common course of things, at least) have a black child. If, therefore, the wife, resident where a black man may have access to her, has a mulatto child, it would be more philosophical to suppose it to be the child of the black, than to imagine such a deviation from the general law of nature, that a white couple cannot procreate a child of the black race. The first supposition has nothing highly improbable about it; while the last, if it be possible at all, is so remotely possible, that it could only be true upon the notion that the child was a lusus natures. 2. I take it that what is (as far as human observation goes) the uniform course of nature, we must call a law of nature. Man can only know the laws of nature by experience; by the uniform course of natural events. It is by this means he knows, that the progeny ■ of the horse will be a horse, if the female be of the same speeies, and the offspring of man will be a human being. Nec imbellem feroces progenerant aquilcs columbam. If then the progeny of the white race be uniformly distinct from that of the black, it may be said to be a law of nature, that a white couple cannot produce a negro or mulatto child. For no experience is more universal than that a white couple always produces white offspring, and never black or mulatto. Among the hundred millions of whites in Europe, there is no authenticated instance of the produce of the white race being other than white, where there was no possibility *577 of access between a black and white. It is only in a country where there are blacks, that this fancied lusus natures is found; and it is, therefore, more reasonable to believe that a mulatto child is the offspring of a meretricious connexion, than to suppose the existence of a miraculous conception and birth, of which the natural history of our species affords no well authenticated instance. Accordingly, we find that intelligent and scientific men have considered it impossible that a black or mulatto child, horn of a white mother, should be the child of a white man. 1 Beck’s Med. Jurispr. 307. citing 1 Edinb. Med. & Surg. Journal 335. and citing also the case of Alexander Whistelo, decided against the opinions of dr. Mitchell, whose learning and extensive research, however, did not avail him to discover, in the history of our species, a single incontestable instance of such a monstrous birth as a black child from parents that were white. Science and philosophy, busied from the time of Aristotle and Pliny to the present day, in recording whatever is curious and remarkable in natural history, have handed down to us, it is believed, not a single case of the kind. On the contrary, it is the settled and established understanding among the intelligent, wherever the black and white races are found together, that the mulatto is the product of the sexual intercourse of the two races. This understanding is the result of general and uniform experience; and from that uniformity, we deduce, as a law of nature and of our species, that a male and female of one of the races never can produce an offspring of the other.